**STATE of Missouri, Respondent,**

v.

**Troy D. CAMPBELL, Appellant.**

**No. WD 35924.**

Missouri Court of Appeals,
Western District.

July 30, 1985.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and
Denied Oct. 22, 1985.

Application to Transfer Denied
Nov. 21, 1985.

Joseph H. Locascio, Special Public Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before NUGENT, P.J., and PRITCHARD and CLARK, JJ.

PRITCHARD, Judge.

Appellant was by the verdict of a jury found guilty of murder in the second degree, § 565.004 RSMo.1978, which assessed his punishment at imprisonment for 22 years. In accordance with the verdict, the trial court sentenced him to 22 years imprisonment in the Department of Corrections.

The sufficiency of the evidence to sustain the conviction is not questioned, but portions of the facts will be set forth as they relate to appellant's first point that the court erred in overruling his motion to quash search warrants and to suppress evidence seized pursuant thereto.

On the night of March 31, 1983, appellant and two friends, Damon Scott and Mike Gilmore, met at a video arcade at Independence Avenue and Quincy, and rode around in appellant's mother's car before picking up the victim, Gina Mills. The four rode around some more before picking up Gina's friend, Carla Sturdevant, and later the group went to Damon Scott's home where appellant and Gina argued about the ownership of a ring. Except for Mike Gilmore, the group left Damon's house and reentered the same car, letting Carla off about 1:00 or 1:30 a.m., after which appellant let Damon off at his home. This left appellant and Gina in the car, and his mother testified that he got home about 12:00 midnight. Gina's mother testified that Gina never came home that night.

On April 1, 1983, a body was found lying beside a road in a puddle of water north of the Montgomery Ward warehouse on North Topping. It was identified later that day as being that of Gina Mills. Hair samples, body cavity swabs and clothing were taken from the body during processing of it.

During the investigation of the death by Detective James Stuckey, he received information that the last place the victim had been seen was in the automobile with appellant, thus he became a suspect in the homicide, and he was arrested on April 6, 1983. It appeared that the automobile was owned by appellant's mother, and when she went to police headquarters to talk with appellant, Stuckey asked her to sign a consent to have her car searched. The record is silent as to whether that consent was given.

Stuckey had seen the body of the victim at the scene and it appeared to him that she had been struck by a car, and he wanted to check it for evidence of hair, skin or flesh, or clothing fibers which could be stuck to its undercarriage or grill. On April 7, 1983, Stuckey made application with supporting affidavit to search for and seize the vehicle owned by Ninca J. Campbell (appellant's mother), describing it as a 2-door 1975 Plymouth Duster, light brown over dark brown color, giving its serial and license numbers. A warrant was issued by an associate circuit judge, and Stuckey's return to it shows that he took hair and fiber from the undercarriage; a cigarette

butt—Marlboro brand—from the front ash tray; carpet standard; tissue paper from trash bag; and sweepings from interior of vehicle. Mrs. Campbell retrieved her car on April 7, 1983.

On June 18, 1983, Detective Angel Gonzalez, with supporting affidavit, applied for a second search warrant of the same vehicle, the documents reciting the recovery from the front left ball joint arm of the vehicle of a hair which was later matched by the Regional Crime Lab Chemist Dan McCarty as belonging to the victim, Gina Mills, and further investigation was needed to investigate possible tool mark and impression comparisons with victim's injuries and clothes. The vehicle was seized at the Dent and Bent Body Shop, 820½ Brighton, and was towed from there to the police vehicle maintenance office, 27th Street Garage, where it was further searched. On this examination, hair was taken from the right fender bolt, front cross structure, steering cross member, right side of front bumper, and the front bumper was removed, on July 27, 1983. The hair from the right front fender bolt matched that of the victim.

In this case, the vehicle was titled in appellant's mother's name. There was no existent insurance policy in the mother's name, nor was there any evidence that appellant was listed as an insured on any policy. Mrs. Campbell testified that appellant used the car on an average of five nights a week. The only set of keys belonged to her. Appellant lived at home where the car was kept, and was responsible for its general maintenance. Appellant had also installed his own tape deck, radio, power boosters and speakers in the vehicle. The state contends that appellant has no standing to object to the search of the car which was owned by his mother, or to seek to suppress the seized evidence.

In the case of *In re J.R.M.,* 487 S.W.2d 502 (Mo. banc 1972), at page 508, the court noted that the earlier Missouri cases, like earlier federal cases, predicated standing on ownership or right to possession, but departed from the view to accord with the case law trend to look beyond the title to property or premises in deciding the standing issue, using an approach on a case by case basis. In *J.R.M.,* the court held that the son had standing to seek to suppress evidence seized from the car, titled in the father's name, where the son had his own keys, used the car regularly as if it were his own; he lived at home where the car was kept and was included in the family insurance policy. The *J.R.M.* court applied " 'a reasonable expectation [on his part] of freedom from governmental intrusion' to seize, dismantle and search the car." [*J.R.M.,* page 509] In *State v. McCrary,* 621 S.W.2d 266, 273 (Mo. banc 1981), the court held that the "reasonable expectation test" is identical to the "legitimate expectation of privacy" test adopted in *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). In this case, considering that appellant lived at home with his mother where the car was kept; that he had practically unlimited use of it; that he was responsible for the car's general maintenance; and that he had installed radio equipment in the car, it must be concluded that he had a sufficient, actual, subjective expectation of privacy for a search of it, and that expectation of privacy was reasonable and legitimate, *McCrary,* supra, p. 273, so as to give him standing to move to suppress the seized evidence. Cf. 3 W. LaFave, Search and Seizure, 576–577 (1978). This holding leads to a consideration of his Point I contentions that the court erred in overruling his motion to quash warrants issued April 7, and June 8, 1983, and to suppress evidence seized pursuant thereto because "(1) The affidavits filed in support of each warrant do not specify exactly the items sought to be recovered from the 1975 Plymouth Duster; and (2) Each search warrant fails to particularly describe the things to be seized from the 1975 Plymouth Duster, thus leaving to the discretion of the officers executing said warrants the items to be searched for and seized."

As noted, Detective Stuckey saw the body at the scene, and he thought she

had been run over by an automobile. His subsequent investigation revealed that she was last seen with appellant in a car, and he obviously determined that the car which appellant was using belonged to his mother. The object of the search warrant was clearly to seize and search the instrument of the homicide, the vehicle. Indeed, both the applications and the affidavits contain information that a witness overheard appellant saying, among other things, that he threw the girl down on the ground and ran over her with the car. All of the information presented to the associate circuit judges in the applications and affidavits, when read by them in a common sense and realistic fashion, *State v. Phillips*, 532 S.W.2d 533, 535[2, 3] (Mo.App.1976), informs them that the instrument of the subject death was the car, and that it was the item to be seized and examined for evidence that the victim had been in it. Specificity once exacted under common law pleadings have no proper place in this area, *Phillips*, supra, citing *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689[7] (1965). Although it might have been more desirable if the officers filling out the printed forms had included some mention of a search for trace evidence in or on the car that the victim had been in it, the absence thereof is not fatal to the validity of the warrants. But it is patently clear that the items to be seized from the impounded vehicle could not have been described with any particularity—i.e., it could not have been known at the outset what evidence would be found until a thorough examination and search of the vehicle had been accomplished. The trial court did not err in failing to quash the search warrants and to suppress the evidence found, and appellant's Point I is overruled.

Venireperson Ernestine Shields was asked by defense counsel whether she had been a victim of a crime. She answered that a close friend of hers with whom she went was murdered the week before, which was an emotional experience for her. She was asked in addition to his family and friends how did she think that was going to

bear on her in this case. She answered, "I don't think I can. I can't do it." "MR. LOCASIO: You don't think you can remain and sit in this case and be fair?" She answered, "No." Ms. Shields had indicated to state's counsel that she knew several police officers, including homicide detectives. She also indicated to defense counsel that a very close friend of hers had committed suicide two years before.

During individual questioning by state's counsel, this occurred: "MR. REGAN: I would like to spend a minute with Ms. Shields, if I may. Ma'am, my apologies on your recent tragedies. Would it be impossible for you, though, to put that aside and sit as a fair and impartial juror here? You think you can do it? VENIREPERSON SHIELDS: Yeah, I think I can. MR. REGAN: You think you could? VENIREPERSON SHIELDS: Yes. MR. REGAN: That is all we ask. Thank you." The legal file shows that appellant expended one of his peremptory challenges to remove Ms. Shields from the panel.

 Although conceding that the trial court has broad discretion in ruling upon challenges for cause, and that the court's ruling should not be disturbed on appeal unless it is clearly against the weight of the evidence and constitutes an abuse of discretion [*State v. Jones*, 384 S.W.2d 554 (Mo.1964)], appellant says there was no basis here for the trial court to exercise its discretion in overruling the challenge for cause. He says, in effect, given the answers of Ms. Shields to defense counsel and to state's counsel, which were contradictory, the trial court should have conducted a more searching inquiry to clear up the matter. Appellant cites and relies upon *State v. Ealy*, 624 S.W.2d 490 (Mo.App. 1981), but that case is distinguishable. There, the venireperson stated that she " 'might be more prejudiced' in favor of a police officer's testimony and that she would 'probably' believe a police officer over another witness." *Ealy*, page 493–494[13, 14]. Neither counsel further interrogated the venireperson, and the trial court did not undertake to elicit clarifying

answers which might have removed any uncertainty as to her qualifications so as to give the reviewing court a basis for deciding whether there had been an abuse of discretion in overruling the challenge, hence the judgment was reversed and the case remanded for new trial. Here, the venireperson was interrogated by state's counsel and she stated she could put aside her tragedies and sit as an impartial juror. Thus, there existed a basis for the trial court to exercise its discretion in ruling the challenge. See also *State v. Gray,* 657 S.W.2d 296 (Mo.App.1983), where two venirepersons were further interrogated by state's counsel (but not by the court), each stating that they could put aside their past experiences and prejudices and decide the case on its facts. *State v. Gray* distinguished the *Ealy* case by reason of the further questioning by state's counsel. *State v. Holliman,* 529 S.W.2d 932 (Mo. App.1975), cited by appellant, is also distinguishable in that there, the venireman knew the victim—a policeman, and was better acquainted with his father; his son was a policeman in the same district as the victim and he had talked with him about the case, all of which would obviously influence him. No such knowledge was shown to have existed with venireperson Shields here. She was merely first concerned with whether she could sit in the case and be fair by reason of her personal tragedies, which she later removed, thus giving a basis for the trial court to exercise its discretion. Point II, raising the issue, is overruled.

The judgment is affirmed.

All concur.